# KELLY *v.* FINNEY ET AL.

[No. 26,442.   Filed February 21, 1935.]

*Albert Ward* and *Fred E. Shick,* for appellants.

*Philip Lutz, Jr.,* Attorney-General, *Joseph P. Mc-Namara,* Deputy Attorney-General, and *Joseph W. Hutchinson,* Assistant Attorney-General, for appellees.

ROLL, J.—This is an action by appellant, Hubert S. Kelly, the owner and operator of several motor vehicles for hire on behalf of himself and others, similarly situated, but too numerous to be joined as plaintiffs, against appellees, for an injunction to prevent appellees and those acting under their direction and in concert with them, from enforcing Chapter 153 of the Acts of the General Assembly for the year 1933, §47-1106, *et seq.* Burns Ann. Stat. 1933, §11247, *et seq.* Baldwin's 1934; Acts 1933, p. 803,[1] concerning the payment of fees by the owners of motor vehicles for hire. The issues were joined by a general denial by each appellee, and the cause was submitted to the court with the request for

Note 1. Motor Vehicles for Hire—Fees—Meaning of Terms. "Section 1. Be it enacted by the general assembly of the State of Indiana, That when used in this act unless expressly stated otherwise:

"(a) The term 'person' means and includes any individual or individuals, corporation, company, firm or copartnership, their

special findings of facts and conclusions of law. Special findings of fact with conclusions of law stated thereon were made, signed and filed by the court.

Conclusions of law to which appellant reserved proper exceptions were as follows:

"First.

That the law is with the defendants, and said Chapter No. 153 of the Acts of the General Assembly of the State of Indiana, at its session of 1933, being House Bill No. 157, and entitled 'An Act concerning the payment of fees by the owners and operators of motor vehicles for hire,' is constitutional and valid.

Second.

That the plaintiff take nothing by his action herein, and the defendants shall recover their costs taxed at $...................

Dated at Indianapolis, Indiana, this 6th day of April, 1934.

CLARENCE E. WEIR,
Judge of Superior Court Room No. 4."

lessees, trustees or receivers appointed by any court whatsoever.

"(b)  The term 'motor carrier' means any individual or individuals, corporation, company, firm or copartnership, their lessees, trustees or receivers appointed by any court whatsoever, owning, controlling, managing, operating or causing to be operated any motor vehicle used in transporting property for compensation or hire over any of the public highways in this state.

"(c)  The term 'suburban territory' means that territory extending one mile beyond the corporate limits of any town or city in this state and one mile additional for each 50,000 population or portion thereof; Provided, That when more than one town or city is contained within the limits of any such territory so described, motor carriers operating in and out of such municipalities within said territory shall be permitted to operate anywhere within the limits of the larger territory so described.

Carriers Without Purview of Act.

"Sec. 2.  The provisions of this act shall not apply:

"(a)  To motor vehicles used exclusively and wholly within the incorporated limits of any city or town in this state and within its suburban territory as herein defined.

"(b)  To motor vehicles used exclusively for carrying the United States mail under contract with the federal government.

"(c)  To any motor vehicle used as a school bus and while engaged in transporting school children to and from school.

"(d)  To motor vehicles transporting live stock, farm or dairy products or supplies from or to farm or dairy or from point of production to market warehouse, creamery or other original place

Judgment was afterwards rendered against appellant upon said conclusions of law, and it was adjudged by the court that said Chapter 153 was constitutional and valid. Appellant thereafter perfected this appeal, assigning as error: (1) the court erred in its first conclusion of law; (2) the court erred in its second conclusion of law.

The facts as found by the court disclose that appellant is a citizen of the United States and a resident of the city of Terre Haute, Indiana. He owns and uses four motor trucks in which he has invested $3600; that said trucks were duly and properly listed for taxation, and that all *ad valorem* taxes due thereon have been paid, and all other taxes except the taxes imposed by the act here in question; that the Highland Creamery Company of Terre Haute, Indiana, is engaged in the manufacture of dairy products and as an incident to said business has established and maintains what is known as sub-stations at various points in Illinois and

of storage, or to or from any distribution depot owned, operated or controlled by any non-profit co-operative association when vehicle [is] owned, leased or operated by a non-profit co-operative association [and/or] when transporting property of the association or, of any of its members, [;] nor shall such vehicle or the owners or operators thereof be considered a motor carrier as defined in this act.

"(e)   To motor vehicles used exclusively in the distribution of newspapers from the publisher to the subscriber or distributor.

"(f)   To motor vehicles the major use of which is for private business of the owner and the use of which for hire is only casual or occasional.

"(g)   To motor vehicles while being used exclusively in transporting household effects belonging to any person who is changing his residence from one place to another and the transportation of which effects is made as a part of changing such residence.

Additional Fees—How Computed.

"Sec. 3.   That in addition to all license fees and taxes otherwise imposed by law upon motor vehicles, there shall be paid to the secretary of state of the State of Indiana, annually, by each motor carrier to which this act applies, the following fees upon each motor vehicle to which this act applies owned or operated by such motor carrier upon any of the highways of the State of Indiana, to wit:

"Upon each motor truck, tractor, trailer or semi-trailer the sum

in Indiana; that said sub-stations serve as a market depot for farmers and producers in their respective localities; that appellant is employed by the said Highland Creamery Company to haul the cream from these various sub-stations to its plant in Terre Haute, and that by reason of being so engaged the trucks owned by him and used in such hauling are subject to the tax imposed by Chapter 153 hereinafter set out.

The special findings disclose that appellant uses four trucks in this business and each truck has a different route. On one route appellant's truck traverses approximately 5400 miles of Indiana highways per annum. Another 4675 miles, another 10,400 miles and the other 792 miles. The record further discloses that other persons, firms, and corporations, engaged in truck transportation of freight, use larger trucks and a larger number and to a greater extent than does appellant. Some of these users of the highway transport merchan-

of one dollar ($1.00) per one hundred pounds of actual gross weight, fully equipped for transportation of freight.

Applicability of Act.

"Sec. 4. The provisions of this act shall apply to all such motor carriers who operate upon any of the highways in this state whether engaged in intrastate business in said state or in interstate business, and regardless of whether any license fee or tax has been paid in any other state by such motor carrier or upon such motor vehicle.

Payment of Fees—Date for—Proviso.

"Sec. 5. The fees herein provided to be paid to the secretary of state shall be paid annually on or before January 1st of each year for the ensuing year; Provided, That any such motor carrier acquiring or operating such a motor vehicle after January 1st of any year shall pay such fee herein prescribed before operating the same upon said highways; Provided however, That if such motor vehicle is acquired or operated after August 1st of any year, then such motor carrier shall pay one-half the fees herein prescribed for the balance of said year.

Fees Collected—Disposition.

"Sec. 6. The fees herein prescribed shall be paid by the secretary of state to the treasurer of the State of Indiana and shall become a part of the general fund of the state to be credited to the state highway fund quarterly to be used by the state highway commission for the construction, maintenance and repair of the

dise owned by themselves as an incident to their business; others are engaged in truck transportation for hire, but pay no tax under the act in question, being exempt therefrom under Sec. 2 of said act. For example the record shows that the Polk Sanitary Milk Company owns 76 motor trucks, the average weight of which is 4,000 pounds, and each travels an average of about 33 miles daily in the city of Indianapolis and within a radius of 40 miles thereof—said trucks being used in the distribution of dairy products to consumers; that they use 56 additional trucks averaging 5600 pounds each to haul dairy products from the farmers and producers to their plant in Indianapolis. The record further shows that the Indiana Condensed Milk Company uses 35 motor vehicles and 5 four-wheeled trailers and 19 one-half ton trucks, weighing from 2775 pounds to 9200 pounds, engaged in the business of processing raw

state highways, except so much thereof as may be appropriated for the expenses of administering this act.

Applications—Forms—Plates.

"Section 7. The secretary of state shall provide proper application blanks and shall furnish a distinctive metal plate at the time of the registration of any vehicle and the payment of the fees as herein provided and such distinctive metal plate shall be prominently displayed on the outside of such vehicle. It shall be unlawful for the owner of any motor truck, tractor, trailer or semi-trailer to use such plate on any vehicle other than the motor truck, tractor, trailer or semi-trailer for which the same was issued.

Unlawful Operation—Violation—Offense—Penalty.

"Section 8. It shall be unlawful for any motor carrier as herein defined to operate any motor vehicle for hire upon which such fee has not been paid or to operate such motor vehicle without displaying the distinctive plate or tag furnished by said secretary of state.

"That any person or corporation who violates any of the provisions of this act shall be guilty of a misdemeanor and be subject to a fine of not less than ten dollars ($10.00) nor more than one hundred dollars ($100.00) and each day such vehicle is operated in violation hereof shall constitute a separate offense.

Effective Date of Act.

"Section 9. This law shall become in full force and effect on August 1, 1933, and one-half the regular annual fees herein provided for shall be paid upon all motor vehicles to which this act applies and which are operated on or after August 1, 1933, for the balance of said year.

milk; that said trucks travel about 45,000 to 55,000 miles per year over Indiana highways; that Schlosser Brothers are engaged in the creamery and ice cream business and use 162 trucks weighing from 2500 to 9000 pounds, most of which are engaged in collecting milk and cream at the farmer's door and hauling it to the plant of the company where it is manufactured into butter and ice cream. Each truck averages about 60 or 70 miles per day. The record also shows that large department stores use a great number of motor vehicles in delivering merchandise sold to their customers; that meat packing companies and canning companies use a large number of heavy trucks in the distribution of their own products; that transfer and storage companies engaged in transporting household goods use many large trucks in their business.

We have not mentioned all of the persons, firms, and corporations mentioned in the record, but sufficient, we think, to present the questions fairly.

The record further discloses that the state of Indiana, through its highway commission, from 1919 to 1933, expended in round numbers $82,000,000 in highway construction, and the further sum of $26,000,000 for "betterments" which is a class of small construction. That the cost of maintenance of these highways from 1920 to 1932 amounted to approximately $36,000,000; that the average cost for maintenance of highways from 1924 to 1932, inclusive, was $488 per mile.

Chapter 153 of the Acts of the General Assembly of the state of Indiana for the year 1933, *supra*, provides in substance as follows.

Section 1 defines the meaning of certain terms used in the act.

Section 2 provides that the provisions of the act shall not apply to certain motor vehicles.

Section 3 provides: "That in addition to all license

fees and taxes otherwise imposed by law upon motor vehicles, there shall be paid to the Secretary of State of the State of Indiana, annually, by each motor carrier to which this act applies, the following fees upon each motor vehicle to which this act applies owned or operated by such motor carrier upon any of the highways of the State of Indiana, to wit:

"Upon each motor truck, tractor, trailer or semi-trailer the sum of one dollar ($1.00) per one hundred pounds of actual gross weight, fully equipped for transportation of freight."

Section 4 provides that the act shall apply to interstate as well as intrastate business.

Section 5 provides the effective date of the act and further provides for one-half of the fees provided the vehicle is acquired or operated after August 1st of any year.

Section 6 provides that the fees herein prescribed shall become a part of the general funds of the state to be credited to the state highway fund and to be used by the highway commission for the construction, maintenance, and repair of state highways, except so much thereof as may be appropriated for the expenses of administering the act.

Section 7 provides for application blanks to be furnished by the Secretary of State and metal plates to be displayed on the vehicle.

Section 8 makes it a misdemeanor for failure to comply with the act and fixes penalty therefor.

Section 9 provides the date when the act takes effect.

Appellant's first proposition under his first assignment of error is that said Chapter 153, *supra,* is unconstitutional and void; that said act denies to him the equal protection of the law and deprives him of his property without due process of law as guaranteed him by Sec. 1 of the 14th amendment of the Federal Consti-

tution. Section 1 of the 14th amendment provides as fol-lows: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Appellant says that the classification made by said Chapter 153, *supra,* namely, trucks *used for hire* as distinguished from trucks *not used for hire,* is an unauthorized classification.

We are unable to agree with this proposition. It is clear, we think, that Chapter 153, *supra,* is not a *regulatory* measure, exercised under the police power granted by the constitution, but has for its purpose the raising of revenue to be used in constructing and maintaining its highways, and in furtherance of this purpose, selects as a general class *motor vehicles used in transporting property for hire over the public highways of the state* as the basis for the imposition of the tax.

It must be remembered that the 14th amendment to the Constitution of the United Staes, as far as the taxing power of the state is concerned, does not compel an unbending rule of equal taxation, nor does it prevent discretion in the selection of subjects or the classification for taxation of property, business, trades, or occupations. This principle of law has been clearly announced by this court and by the Supreme Court of the United States. See *City of Terre Haute* v. *Kersey* (1902), 159 Ind. 300, 309, 64 N. E. 469; *State Board of Tax Commissioners of Indiana* v. *Jackson* (1931), 283 U. S. 527, 537 and cases there cited.

The difference between the use of the highways in the transportation of property *for hire* and the use of the highways in the transportation of property *not for hire* is, we think, fundamental and inherent. This dif-

ference may not be reflected in the amount of miles traveled on the highways, but it is reflected in the nature of the business for which the highways are used. The one who uses the highways for the transportation of freight *for hire* makes the highway his place of business and an essential part of it, while the one who uses the highway in the transportation of his own property uses it as an *incident* to some other business. This distinction is not obliterated by the fact, as shown by the record in this case, that there are persons, firms, and corporations engaged in business enterprises that use the highways of the state to a greater extent in transporting their own property than does appellant or others similarly situated. This distinction was very clearly recognized by the Supreme Court of the United States in the case of *Pacific Express Company* v. *Seibert* (1892), 142 U. S. 339, 353. In that case a Missouri statute imposed a burden upon certain express companies who did not own their own means of transportation, but whose transportation business was on contract for hire with railroad or steamboat companies. The court says: "There is an essential difference between express companies defined by this act and railroad or steamboat companies or other companies that own their own means of transportation. The vital distinction is this: Railroad companies pay taxes on their road-beds, rolling stock, and other tangible property . . . On the other hand, express companies, such as are defined by this act, have no tanglible property, of any consequence, subject to taxation under the general laws. There is therefore no way by which they can be taxed at all, unless by a tax upon their receipts for business transacted. This distinction clearly places express companies defined by this act in a separate class from companies owning their own means of transportation.

It is obvious that persons or corporations engaged in

the business of truck transportation for hire as a general class have, or might have, comparatively small holdings subject to the ordinary *ad valorem* tax, while persons engaged in transporting their own property as an incident to some other business, as a class, are the owners of much property that is subject to the ordinary *ad valorem* tax.

It is a well established rule of law that the highways of the state belong to the state, and their primary use is for private purposes, and their use for transportation for gain is special and extraordinary which the legislature may prohibit or condition as it sees fit. *Stephenson* v. *Binford* (1932), 287 U. S. 251 and 264 and cases cited, and the state may also exact a license fee for the right to use the highways. It was so declared in the case of *Hicklin* v. *Coney* (1933), 290 U. S. 169, 78 L. Ed. 243; *Continental Baking Co.* v. *Woodring* (1932), 286 U. S. 352, 365, 366; *Clark* v. *Poor* (1927), 274 U. S. 554, at 557; *City of Terre Haute* v. *Kersey, supra.*

It is common knowledge that contract hauling over the highways of this state and elsewhere has had a very rapid growth in the last few years, and that the highways are being taken and badly used by motor vehicles engaged in the transportation of freight for hire. The use of the highways of the state by a vast and constantly growing number of contract carriers has developed a very difficult and perplexing public problem. Sound public policy justifies action on the part of the legislature to conserve the public highways for their primary use, and also to prevent the distruction of our railroad system in which the people of our state have a very vital interest. The vast amount of contract hauling over the highways of our state has not only subjected the highways to an additional burden, but has had the effect of greatly reducing the amount of freight which

would be carried by the railroads within the state. Certainly the removal or amelioration of that burden, with its resulting improvement of the highways, less interference with their primary use and the benefit to the railroads, in whose welfare the public has an interest, creates a legitimate subject for the exercise of the legislative power of the state. That this was one of the chief ends of the act in question is clear, and the act in question was but a means adopted to accomplish the legitimate end of both conserving the state highways and the protection of other common carriers. The extent to which this act, as a means, conduces to that end, the degree of its efficiency, the closeness of its relationship to the ends sought to be attained, are all matters addressed to the sound judgment of the legislature, and not a question for the courts to decide. It is sufficient if it can be seen that in any degree, or under any reasonably conceived circumstances, there is an actual relation between the means employed and the end to be accomplished. *Stephenson* v. *Binford, supra.* Any diversion of traffic from the highways to the railroads must correspondingly relieve the former to that extent, and therefore contributes directly to their conservation and to restore the highway to its primary use, and at the same time contribute to the successful operation of railroads in which the public likewise is interested. It was said in *Sproles* v. *Binford* (1932), 286 U. S. 374, 394, 76 L. Ed. 1167, where a similar question was involved, "The State has a vital interest in the appropriate utilization of the railroads which serve its people, as well as in the proper maintenance of its highways as safe and convenient facilities. The State provides its highways and pays for their upkeep. Its people make railroad transportation possible by the payment of transportation charges. It cannot be said that the State is powerless to protect its highways from being sub-

jected to excessive burdens when other means of transportation are available. The use of highways for truck transportation has its manifest convenience, but we perceive no constitutional ground for denying to the State the right to foster a fair distribution of traffic to the end that all necessary facilities should be maintained and that the public should not be inconvenienced by inordinate uses of its highways for purposes of gain. This is not a case of a denial of the use of the highways to one class of citizens as opposed to another or of limitations having no appropriate relation to highway protection."

We conclude that the classification as made in Chapter 153, *supra,* on trucks used *for hire* as the basis for the imposition of a tax as against transportation in trucks *not for hire* is a legitimate and reasonable classification for taxation purposes, and appellant's rights, as guaranteed by Section 1 of the 14th amendment to the Federal Constitution, have not been infringed.

Appellant further says that to require the payment of a flat fee of one dollar ($1.00) per 100 pounds, gross weight, fully equipped for transportation of freight on trucks, tractors, trailers or semi-trailers, used in transporting property for hire over the highways of the state, as provided by Chapter 153, *supra,* being in no way dependent upon size, type, weight capacity or the actual use which such vehicle might make of the highways, either of the miles traveled, tonnage carried, or earnings of such operator, is arbitrary, oppressive, discriminatory, unreasonable and void. It will be noted that the above statement is not entirely correct, as the fee charged is based upon gross weight, fully equipped for transportation of freights, and has a very close relation to size and capacity. We think this proposition cannot be sustained by the authorities.

In the case of *Hicklin* v. *Coney, supra,* the constitutionality of an act of the legislature of the state of South Carolina was questioned. See Acts of South Carolina, 1930, p. 1067. Also *State ex rel. Coney* v. *Hicklin* (1932), 168 S. C. 440, 167 S. E. 674. The act there in question involved owners of trucks required by the act to hold what was designated as a certificate "F", and provided that they pay annually to the commission a fee based upon the carrying capacity as follows: for 1½ ton truck or less, $30.00; over 1½ ton and not over 2 ton, $60.00; for 2 tons and not over 3 tons, $120.00; over 3 tons and not over 4 tons, $200.00; over 4 tons and not over 5 tons, $400.00, fully equipped with pneumatic tires. If partially or fully equipped with solid tires, the fees were to be double. The statute also provided that the fees collected should be used for the purpose of maintaining the public highways over which such motor vehicles would operate, as compensation for their use. It will be noted that the above statute, as does Chapter 153, *supra,* imposed a so-called "flat fee" based upon carrying capacity without reference to the miles traveled or earnings of the owner. This statute was sustained against constitutional objections, and the court said: "Carrying capacity of trucks unquestionably has a direct relation to the wear and hazards of the highways. It is for this reason that the authority to impose directly, reasonable limitations on the weight and size of vehicles, although applicable to interstate carriers, has been sustained. . . . As the state may establish such regulations directly the state may adjust its license fees, otherwise valid, as being reasonable and exacted as compensation for the use of the highways according to carrying capacity in furtherance of the same purpose."

This same principle was involved and upheld by this court in the case of *Baldwin* v. *State* (1924), 194 Ind.

303, 141 N. E. 343, where the motor vehicle registration act of 1921, Acts 1921, Chapter 214, p. 579, which provided for a graduated license on motor vehicles, except trucks, on the basis of horse power, and in the case of trucks on the basis of capacity. This classification has been very clearly approved in *Continental Baking Company* v. *Woodring, supra; Clark* v. *Poor, supra; City of Terre Haute* v. *Kersey, supra.*

If a flat fee, based upon carrying capacity, furnishes a sufficient basis for exacting a so-called "flat fee," we can perceive of no reason why gross weight, fully equipped for transportation of freight does not also furnish a sufficient basis for the imposition of such a fee.

Appellant cites and relies upon the case of *Sprout* v. *City of South Bend* (1928), 277 U. S. 163. In the South Bend case the ordinance prescribed license fees varying with the seating capacity of the bus, and applying alike to busses operating wholly in the city and to those operating from points within it to points without. The ordinance makes no distinction between busses engaged exclusively in interstate commerce and those engaged exclusively in intrastate commerce and those engaged in both classes of commerce. The court held that the ordinance was unconstitutional first because it was a regulatory measure and held, that a fee may be exacted if no larger in amount than is reasonably required to defray the expenses of administering the regulation, and that it did not appear that the license fees in question were imposed as an incident to municipal regulations, nor that the proceeds were applied to defraying the expenses of such regulation, nor did it appear that the amount collected was no more than was reasonably necessary for such purposes, and therefore the ordinance could not be sustained as a police measure. The court also held that a revenue measure may be imposed, even on motor vehicles engaged exclusively in interstate

commerce, as a reasonable charge and as its fair contribution to the cost of constructing and maintaining the public highways, but the ordinance in question was not a revenue measure, because it imposed a flat fee for busses plying the streets continuously in local service the same as those making only one trip per day, and the so-called fees were not used for the purpose of maintaining or constructing highways, and therefore it was held that it was not a revenue measure. The court held that it was not a valid act as an occupation tax. The court also held that such a tax might be levied by the state on one engaged in both intrastate and interstate commerce, but in order for such a levy to be valid it must appear that it was imposed solely on account of intrastate business, and that one engaged exclusively in interstate commerce would not be subject to the imposition, and inasmuch as the ordinance applied to one engaged in interstate business, the same as to those engaged in intrastate business, it was invalid.

The distinction was pointed out very clearly by the Supreme Court of the United States in *Hicklin* v. *Coney, supra.* The same is true with the case of *Interstate Transit* v. *Lindsey* (1931), 283 U. S. 183, also cited and relied upon by the appellant. The case of *Union Tank Line* v. *Wright* (1919), 249 U. S. 275 and *Quaker City Cab Company* v. *Pennsylvania* (1928), 277 U. S. 389, cited and relied upon by appellant, furnish no support to appellant's contention. In the Union Tank Line case an *ad valorem* property tax was imposed, and the question there considered and decided was the legality of the method used in obtaining the assessed valuation of the property of appellant which was liable to taxation. The appellant in that case was the owner of tank cars and they were leased and used by the lessee in transporting merchandise in and out of the state of Georgia. These tank cars were not permanently within

the state. The average number of cars in the state of Georgia during the year was 57. The taxing officials of the state of Georgia refused to accept this number as the basis for imposing the tax, but sought to assess the property upon a different basis, and the court refused to adopt the method followed by the lower court and held that the miles traveled within the state by appellant's cars had no relation to the value of its physical property within the state. In the Quaker City Cab Company case, the state of Pennsylvania passed a statute that taxed the gross income of corporations engaged in the business of transporting freight or passengers. The classification imposed a tax upon *corporations* only and for that reason the law was held unconstitutional because it violated the equal protection clause of Section 1 of the 14th amendment of the Federal constitution. We think these cases are clearly distinguishable from the case at bar, and the principles there involved are not controlling in this case.

The appellant says that the exemptions and exclusions as provided in Sec. 2 thereof are unreasonable, arbitrary, and constitute an illegal discrimination against appellant, and therefore is in violation of the due process and equal protection clause of the 14th amendment to the Federal Constitution, and calls our attention to the cases of *Union Tank Line.* v. *Wright, supra; Smith* v. *Cahoon* (1931), 283 U. S. 553; *Louis* v. *Boynton* (1931), 53 Fed. (2nd) 471; and *Nutt* v. *Ellerbe* (1932), 56 Fed. (2nd) 1058.

Sub-section (a) of Section 2 exempts motor vehicles used exclusively and wholly within incorporated limits of any city or town in this state, or within its suburban territory, as defined in sub-section (c) of Section 1.

Statutes which provide exemptions similar to those stated in Section 2, *supra,* have heretofore been challenged, and without exception, as far as we are advised

at present, have been sustained. In the case of *Continental Baking Co.* v. *Woodring, supra,* the constitutionality of a like exemption was questioned. The exemptions as set out in the opinion,. page 358, were as follows: "(1) Motor vehicles operating wholly within any city or village of this state, (2) private motor carriers operating within a radius of 25 miles beyond the corporate limits of any such city or village, (3) the transportation of live stock and farm products to market 'by the owner thereof or supplies for his own use in his own motor vehicle,' and (4) the transportation of children to and from school." In discussing the first exemption above, which excludes from the application of the act motor carriers which operate wholly within the city, the court held that such exclusion has an "obvious reasonable basis, as such operators are subject to local regulations. In protecting its highway system the state was at liberty to leave its local communities unembarrassed and was not bound either to override their regulations or to impose burdensome additions." In discussing the suburban exemption the court said: "The first question is whether the state, in legislation of this sort, may provide for such carriers an exempt zone contiguous to its municipalities. We find no difficulty in concluding that it may. As the District Court pointed out, there is 'a penumbra of town' that is outside municipal limits, and delivery trucks, of those having establishments within the municipalities, in their daily routine, repeatedly cross these limits 'in going back and forth into these outlying additions.' " The court held that the fixing of the radius at 25 miles beyond the corporate limits was within the legislative discretion and was valid. The reasoning of the court in the above case, we think, is sound and applicable to the question here under consideration, and the exemption of this sub-section is not discriminatory or invalid.

As to the exemption of motor trucks engaged in the transportation of school children contained in sub-section (c) of Section 2, *supra,* the court in the last above case cited said: "The distinctive public interest in this sort of transportation affords sufficient reason for the classification."

The exemptions in sub-section (b) of Section 2, which exempts motor vehicles used exclusively in carrying United States mail is also affected with the public interest, and can be sustained upon the same principles as the transportation of school children, and for that reason the classification is not invalid.

Sub-section (e) of Section 2 exempts motor vehicles used exclusively in the transportation of newspapers from the publisher to the subscriber or distributor. Here again the public interest is involved. Newspapers today are read almost universally, and form a very important part of our educational and business life. The general public is interested in rapid, frequent, and cheap distribution of newspapers. No other type of transportation under modern and present day conditions would suffice, and the exemption of such transportation could well be made by legislative enactment in aid of this general public policy.

The exemptions provided in sub-section (d) are not entirely free from ambiguity. Appellant assumes that under this section all motor vehicles engaged in transporting live stock, farm or dairy products, or supplies from or to farm or dairies, etc., are exempt from the tax herein imposed, while appellee contends that such motor vehicles are not exempt unless owned, leased, or operated by a non-profit co-operative association when transporting property of the association or any of its members. From the conclusion we have reached, it is not necessary for us to decide this question, for even if we asume appellant's contention is the correct interpre-

tation of this sub-section, such classification would not invalidate the act. The legislature knew that the use of the state highways for the transportation of live stock or farm or dairy products, etc., coming within the exemption is relatively small and *incidental,* and is also affected with a general public interest, and such classification, we think, is entirely permissible. This holding is in accord with the holding of the Supreme Court of the United States in the case of *Continental Baking Company* v. *Woodring, supra.*

Sub-section (f) of Section 2 exempts motor vehicles, the major part of which is for private business of the owner, and the use of which, for hire is only casual and occasional. The legislature rightfully concluded, we think, that the use of the highways for this purpose would be adequately compensated by the general tax imposed (general license tax) on all motor vehicles and the gasoline tax imposed under the Acts of 1923, Chapter 182, page 532.

Sub-section (g) as far as we are informed, has never been passed upon by the courts. This exemption is in favor of motor vehicles used exclusively in transporting household effects belonging to any person who is changing his residence from one place to another. We know, as a matter of fact, that vehicles engaged in this type of business operate to a large extent within the various cities of the state, and are in this respect very similar to the exemptions under sub-section (a) and likewise subject to local regulations. The number of people who move from one part of the state to a more distant part is relatively small, and usually the truck so engaged makes the return trip empty. The railroad transportation in this particular type of hauling would be expensive to the person moving. It would necessitate three separate and distinct operations, (1) from the home to the depot by truck, (2) from point of shipment to des-

tination by the railroad, and (3) from the destination to the new home by truck. This would impose an added burden to such persons, and we think it entirely legitimate for the legislature to give some relief to this class of citizens.

The cases cited and relied upon by appellant in support of his contention that these exemptions are arbitrary and unconstitutional, are very easily distinguished from the case at bar. The case of *McLeaish & Co.* v. *Binford* (1931), 52 Fed. (2d) 151, was a regulatory measure passed in pursuance to the police power, and made it unlawful to operate on the state highways a truck carrying more than 10 bales of cotton unless all of the bales had been compressed to a certain named density. As a regulatory measure the court held that there was no sound basis for such a classification. There could be no difference between a truck loaded with cotton and a truck loaded with other merchandise as far as the safety of the highway was concerned. The same distinction is found in the case of *Smith* v. *Cahoon, supra,* which also involved a regulatory statute based on the interest of public safety, and the court there held that it was unable to see a distinction, as far as the safety of the highway was concerned, in the use of the highway by a truck loaded with agricultural products, as distinguished from one loaded with other kinds of freight. This was the basis of the decision in the South Bend case, *supra,* cited and relied upon by appellant. It was there pointed out that the ordinance in question was a police measure and as such was invalid for improper classification.

The case of *Nutt* v. *Ellebe, supra,* had under consideration the same law that was subsequently held valid by the Supreme Court of the United States in the case of *Hicklin* v. *Coney, supra.*

Appellant's second proposition is that said Chapter

153, *supra,* violates Sec. 23 of Article 1 of the Constitution of the State of Indiana which provides: ■ "The General Assembly shall not grant to any citizen as class of citizens privileges or immunities which upon the same terms shall not belong to all citizens."

As far as the question here involved is concerned, the requirements of Section 23 of Article 1 of the Indiana Constitution are substantially the same as the requirements of the 14th amendment of the Federal Constitution, and for that reason what we have heretofore said in regard to the 14th amendment is applicable to this section of the Indiana Constitution, and therefore we need not discuss further the questions presented under this second proposition. *Hirth-Krause Co.* v. *Cohen,* (1912), 177 Ind. 1, 97 N. E. 1; *State Board of Tax Commissioners* v. *Jackson, supra.*

Appellant's third proposition is that Chapter 153, *supra,* violates Secs. 22 and 23 of Article 4 of the ■ Constitution of the State of Indiana, which prohibits the passage of local or special laws.

A law is not local or special within the meaning of these sections of our constitution where it operates uniformly upon all persons throughout the state under the same circumstances and conditions. *Gilson* v. *Board of Tax Commissioners* (1891), 128 Ind. 65, 27 N. E. 235; *Palmer* v. *Stumph* (1868), 29 Ind. 329.

The fact that a statute exempts from its operation certain classes does not render the act local or special as long as the classification is not unreasonable or arbitrary. *Continental Baking Company* v. *Woodring, supra; Schwartzman Service Inc.* v. *Stahl* (1932), 60 Fed. (2nd) 1034-1038; *Long* v. *State* (1910), 175 Ind. 17, 92 N. E. 653. It is well settled that a law is general and uniform if all persons under the same conditions and in the same circumstances are treated alike, and

the classification is reasonable and naturally inherent in the subject matter. *Davis Coal Co.* v. *Polland* (1902), 158 Ind. 607, 617, 62 N. E. 492.

Since we have pointed out above the reasons why the classifications and exemptions are not unreasonable and arbitrary and naturally inherent in the subject matter classified, we see no reason for extending the discussion on this point.

Appellant under his third proposition also urges the invalidity of chapter 153, *supra,* for the reason that it violates Section 1 of Article 10 of the state constitution which commands that "The general assembly shall provide by law, for a uniform and equal rate of assessment and taxation." This act does not purport to impose a property tax upon motor vehicles. It has been repeatedly held that Section 1 of Article 10 of the Indiana Constitution applies only to property tax, and has no application whatever to license, occupation, or use tax. In the case of *Gafill* v. *Bracken, Auditor of State* (1925), 195 Ind. 551, 559, 146 N. E. 109, which involved the validity of the gasoline tax law (Ch. 182, Acts 1923, p. 532) the court said: "It is not the gasoline which is taxed, but the use made of it within the State. And in imposing taxes of this character, the legislative power is untrammeled, except that invidious discrimination will not be permitted." See authorities cited, page 559.

Appellant also says that the title of the act does not conform to the requirements of Section 19 of Article 4 of the Constitution of Indiana which provides that "Every act shall embrace but one subject and matters properly connected therewith; which subject shall be embraced in the title . . ."

We think all of appellant's constitutional obpections to the title of Chapter 153 are answered in the following excerpt from the case of *Western Union Telegraph Co.*

v. *Braxtan* (1905), 165 Ind. 165, 168, 74 N. E. 985: "We realize that it is quite common with legislators in the framing of titles to bills, under promptings of extreme caution, to follow the general subject by a statement of particulars, or details—sometimes all, sometimes only in part. In such cases, if the subject is well stated, the specifications and details become sur- plusage, and of little consequence, for they neither in- validate the act, nor limit its application to any pro- vision that is germane to the general subject expressed in the title, unless the language employed in the title clearly shows that it was the legislative intent to con- fine the act to the particulars specified. *Chicago, etc., R. Co.* v. *State, ex rel.* (1899), 153 Ind. 134; 1 Lewis' Sutherland, Stat. Constr. (2d Ed.), §131; *State, ex rel.,* v. *Atherton* (1886), 19 Nev. 332, 10 Pac. 901; *In re Sugar Notch Borough* (1899), 192 Pa. St. 349, 43 Atl. 985.

"Considered in the light of these rules, the title under consideration seems to be devoid of difficulty. It reads: 'An act prescribing certain duties of telegraph and tele- phone companies, prohibiting discrimination between patrons, providing penalties therefor, and declaring an emergency.' It is here announced that the subject of the proposed legislation is the prescribing of certain duties of telegraph companies. Under such a notice leg- islators should reasonably expect the imposition of spe- cific duties, and the institution of some suitable and ef- ficient means for the enforcement of such duties. So it may be said that the imposition of any reasonable duty, and the prescribing of any reasonable measure for se- curing a performance of such duties, would be germane to the title.

"Besides the first clause of the title fully expressed the subject of the act. The second clause, 'prohibiting discrimination between patrons,' really means nothing

that is not comprehended within the first. Prohibiting discrimination is the prescribing of a duty—the duty of refraining from treating one patron less liberally than another. It is, within the meaning of the title, in every sense as much a duty to refrain from discrimination, as it is to receive and transmit messages with impartiality. And one is just as responsive and germane to the general subject expressed in the first clause of the title as the other. The second clause must therefore be held to be merely a specification within the general meaning of the first. The third clause, 'providing penalties therefor,' is clearly a detail, which, as we have seen, might have been as well omitted as inserted."

Appellant also urges that Chapter 153, *supra*, is in conflict with the Commerce Clause of the Federal Constitution which provides: "Congress shall have power . . . to regulate commerce with foreign nations and among the several states." As heretofore pointed out, the fee imposed by Chapter 153, *supra*, upon motor trucks engaged in transporting freight for hire is not a regulatory measure nor an exercise of the police power of the state, but is a fee imposed for the right to use the highways, and calculated to be at least a reasonable and fair contribution by those embraced within its provisions for the wear and tear of the highways occasioned by their use. In the case of *Sprout* v. *South Bend, supra,* the court said, p. 170: "It is true also that a State may impose, even on motor vehicles engaged exclusively in interstate commerce, a reasonable charge as their fair contribution to the cost of constructing and maintaining the public highways . . . An exaction for that purpose may be included in a license fee." See also *Clark* v. *Poor, supra.*

There was no finding by the lower court in this case that the fees exacted on trucks engaged in transporting freight for hire were excessive or in excess of their fair

contribution to the construction and maintenance and upkeep of the highways which they use. The act in question does not discriminate against trucks used in interstate commerce as compared with trucks used in intrastate commerce. We can see no conflict between Chapter 153 and the Commerce Clause of the Federal Constitution. *Hicklin* v. *Coney, supra.*

Appellant's sixth proposition that the act is void for uncertainty is so clearly without merit that we need not discuss this proposition.

We have considered all of the questions presented by appellant in his brief, and find no constitutional objections, either federal or state, to Chapter 153, *supra,* and conclude that said chapter is valid as against the constitutional objections urged by appellant in his brief. Judgment therefore is affirmed.