**SCHWARTZMAN SERVICE, Inc., v.
STAHL et al.**

No. 465.

District Court, W. D. Missouri, Central Division.

July 26, 1932.

James R. Claiborne (of Bishop & Claiborne), and Burr S. Goodman, both of St. Louis, Mo., for plaintiff.

Albert Miller, Asst. Atty. Gen. (for Stratton Shartel, Atty. Gen.), D. D. McDonald, Gen. Counsel, of Jefferson City, Mo.,

and G. C. Murrell, Asst. Counsel for Members of Public Service Commission of Missouri, of Hartville, Mo., for defendants.

Before VAN VALKENBURGH, Circuit Judge, and OTIS and REEVES, District Judges.

REEVES, District Judge.

This case involves the constitutional validity of certain sections of the statutes of Missouri. The particular act assailed relates to "Transportation of persons by motor vehicles over public highways of the State of Missouri."

The original act may be found in article 8 of chapter 33, Revised Statutes of Missouri 1929, but the General Assembly of the state, at its session in 1931 (Laws 1931, p. 304 [Mo. St. Ann. §§ 5264–5280]), amended said law by repealing the whole of said article 8 and enacting in lieu thereof seventeen new sections, numbered 5264 to 5280, both inclusive. The new article was thereafter designated as article 8, and was intended "for the supervision, regulation and licensing of transportation of persons and property for hire over the public highways of the state of Missouri by motor vehicles; conferring jurisdiction upon the public service commission to license, regulate and supervise such transportation; providing for the enforcement of the provisions of this act and for the punishment for violation thereof."

The legislative enactment defined a "motor vehicle" as "any automobile, automobile truck, motor bus, truck, bus, or any self-propelled vehicle not operated or driven upon fixed rails or tracks."

For all the purposes of this case, said act divided the use of such motor vehicles into two classes; The one designated as "motor carrier," which was given a meaning equivalent to that of a common carrier; and the other designated as a "contract hauler." A contract hauler was defined as "any person, firm or corporation engaged, as his or its principal business, in the transportation for compensation or hire of persons and/or property for a particular person, persons, or corporation to or from a particular place or places under special or individual agreement or agreements and not operating as a common carrier and not operating exclusively within the corporate limits of an incorporated city or town, or exclusively within the corporate limits of such city or town and its suburban territory as herein defined."

"Suburban territory" was defined as "that territory extending one mile beyond the corporate limits of any municipality in this state and one mile additional for each 50,000 population or portion thereof. Provided that when more than one municipality is contained within the limits of any such territory so described, motor carriers operating in and out of any such municipalities within said territory shall be permitted to operate anywhere within the limits of the larger territory so described." Mo. St. Ann. § 5264, subds. a–c, e.

Other definitions and certain regulatory provisions with respect to motor carriers will be omitted. It is sufficient to say that the act contained comprehensive and explicit provisions with reference to "contract haulers" wholly separate and apart from those regulations appertaining to motor carriers. Some provisions were common to both.

Section 5270 specifically applies to contract haulers and clothes the Public Service Commission "with power and authority * * * to license, supervise and regulate every contract hauler in this state except as provided in section 5265 of this act and to fix or approve the rates, fares, charges, classifications, and to prescribe maximum but not minimum scales of rates for general application throughout the state and rules and regulations pertaining thereto; to regulate and supervise the accounts, schedules, service and method of operating of same; to prescribe a uniform system of classification of accounts to be used and after such accounting system shall have been prescribed, contract haulers shall use no other; to require the filing of annual and other reports and any other data; and to supervise and regulate contract haulers in all matters affecting the relationship between such contract haulers, their customers, and the public."

This is followed by a general grant of authority to the Public Service Commission "to prescribe rules and regulations governing all contract haulers." The statute sets out certain specific regulations in the matter of the acceptance of both persons and property for transportation to be incorporated in the regulations of the commission.

Section 5271 imposes upon such contract haulers the duty to obtain permits from the Public Service Commission. This permit is characterized as a "contract hauler permit." The object of such permit is to enable the Public Service Commission to determine the need for such service and the effect of such added transportation facility "upon other transportation service being rendered." All contract haulers are required by said enactment to file an application for a permit in

writing; to give information concerning the ownership, financial condition, equipment to be used, and the physical property of the applicant, as well as a statement as to the complete route over which the applicant desires to operate or the territory to be served, and to which shall be added a schedule or schedules of proposed rates.

By section 5274, the Public Service Commission is vested with authority to formulate and promulgate "such safety rules and regulations as it may deem necessary to govern and control the operation of motor carriers or contract haulers over and along the public highways of this state, and the equipment to be used."

The following, among others, are specified by the Legislature to be included in such rules: (a) Motor vehicle shall be safe and sanitary. (b) The driver must be of good moral character, and competent to operate the motor vehicle, and at least 21 years old. (c) Accidents shall be reported to the Public Service Commission. (d) Each vehicle shall be distinctly marked. (e) The speed of such a vehicle shall be limited to forty miles per hour. Penalties are prescribed for a violation of these rules or for the violation of any of the provisions of the act (section 5275), such as failure to obtain permits, etc.

The last section of the act, being section 5280, announces the object of the legislation as follows: "It is hereby declared that the legislation herein contained is enacted for the sole purpose of promoting and conserving the interests and convenience of the public, and that no right, privilege, or permit granted or obtained under or by virtue of this act shall ever be construed as a vested right, privilege, or permit; and the general assembly retains full legislative power over, concerning and pertaining to the subject or subjects legislated upon in this act and the power and right to alter, amend or repeal this act at its pleasure. Provided, the provision of this act shall not apply to trucks of one and one-half ton capacity and less."

As may be observed from the foregoing, the enactment contains certain exemptions from the obligations and duties imposed by the act. These exemptions are found in section 5265, and are as follows: "The provisions of this act shall not apply to any motor vehicle of a carrying capacity of not to exceed five persons, or one ton of freight, when operated under contract with the federal government for carrying the United States mail and when on the trip provided in said contract; nor any motor vehicle owned, con-

trolled or operated as a school bus; nor taxicab, as herein defined; nor to motor vehicles used exclusively in transporting farm and dairy products from the farm or dairy to warehouse, creamery, or other original storage or market; nor to motor vehicles used exclusively in the distribution of newspapers from the publisher to subscribers or distributors."

Alleging that it was a "contract hauler" within the definition of said law, the plaintiff further avers in its bill that an unconstitutional element pervades the whole of said law. It particularly challenges the exemptions provided for in said section 5265, and more specifically the following language contained therein: "Nor to motor vehicles used exclusively in transporting farm and dairy products from the farm or dairy to warehouse, creamery, or other original storage or market."

It is asserted by the plaintiff that said provision impinges upon constitutional guaranties, both state and national.

Affidavits submitted at the hearing disclosed that the state had invested approximately $200,000,000 in its highways, and that the plans for additional highways would in the immediate future involve an outlay of an additional $75,000,000. Moreover, it appeared that the increase of motor vehicles for hire upon the highways of the state had been enormous, and that there was no abatement in such increase; furthermore, that the conditions upon the highways were not only chaotic, but that the unregulated and uncontrolled use of motor vehicles both by common carriers and contract haulers had become a menace not only to the highways themselves, but to the people who traveled thereon. This condition existed at and prior to the enactment of the statutes under observation. In fact the Governor of the state, because of the said chaotic condition upon the highways, specially called the attention of the General Assembly thereto and urged legislative relief.

The Constitution of Missouri (article 5, § 9) devolves upon the Governor, as the chief executive of the state, the duty to give to the General Assembly information relative to the state of the government and to recommend to its consideration such measures as he may deem necessary and expedient.

Obedient to this provision, the Governor, in his message concerning the highways, said:

"Today the state highways, which are the property of the people and a matter of great pride and concern to them, are being more

and more crowded with busses and trucks, which, by reason of their great length, width and weight, bid fair, unless restrained, to crowd off the private vehicles, to accommodate which, primarily, the highways have been constructed. * * *

"The trucks are serving as a convenience to farmers and shippers generally, and the busses are an accommodation to the traveling public. Their use of the highways, however, should be restricted and regulated to protect those traveling in private vehicles, and limitations should be placed on their equipment to prevent damage to the highways and to protect citizens using the highways."

The whole enactment, in view of the foregoing, appears to be designed to accomplish the legislative purpose as declared by it "of promoting and conserving the interests and convenience of the public."

It is obvious, in view of the evidence before the court, that it was needful legislation not only to limit the number of motor vehicles in use on the highways, both as common carriers and contract haulers, but in like manner to supervise and regulate them in the matter of the size of the trucks, the character of business done, and the responsibility of the operators.

It is the main contention of the plaintiff that said enactment is unconstitutional because discriminatory in favor of "motor vehicles used exclusively in transporting farm and dairy products," et cetera.

■ 1. At the outset it must be acknowledged that the state has the power to regulate and control the movements of motor vehicles over its highways. This it may do in the interest of public convenience and safety and for the protection of the highways. Provisions of this character have been uniformly sustained. Buck v. Kuykendall, 267 U. S. 307, loc. cit. 314, 45 S. Ct. 324, 69 L. Ed. 623, 38 A. L. R. 286; Stephenson v. Binford et al. (D. C.) 53 F.(2d) 509.

■ Moreover, while "a citizen may have, under the Fourteenth Amendment, the right to travel and transport his property upon them by auto vehicle," yet "he has no right to make the highways his place of business by using them as a common carrier for hire. Such use is a privilege which may be granted or withheld by the state in its discretion, without violating either the due process clause or the equal protection clause." Packard v. Banton, 264 U. S. 140, loc. cit. 144, 44 S. Ct. 257, 68 L. Ed. 596.

■ The highways belong to the state. It may make provisions appropriate for securing the safety and convenience of the public in the use of them. Kane v. State of New Jersey, 242 U. S. 160, 37 S. Ct. 30, 61 L. Ed. 222.

■ 2. Assuming, therefore, the power and right of the state to regulate and supervise its highways, such right cannot be hampered or restricted within narrow bounds. On the contrary, to the end that such right might be fully enjoyed and exercised, there is a constant recognition of the principle that the state "has a broad discretion in classification in the exercise of its power of regulation." Smith v. Cahoon, 283 U. S. 553, loc. cit. 566, 51 S. Ct. 582, 587, 75 L. Ed. 1264. Upon such classification, no person can interpose an objection, save only in those cases where the classification or discrimination is entirely arbitrary.

■ 3. Every presumption must be indulged in favor of the constitutionality of the law. While validity of a statute cannot stand upon legislative declaration alone, yet the rule is that "the legislative declaration of purpose and policy is entitled to gravest consideration, and, unless clearly overthrown by facts of record, must prevail." Foster Packing Co. v. Haydel, 278 U. S. 1, 49 S. Ct. 1, 73 L. Ed. 147; Stephenson v. Binford (D. C.) 53 F.(2d) 509, loc. cit. 514.

The rule was well stated in Continental Baking Co. v. Woodring (D. C.) 55 F.(2d) 347, loc. cit. 353, wherein Judge McDermott of the Tenth Circuit said: "When the Legislature acts within the scope of its legislative power, when no facts are disclosed as to the reasons which actuated the legislation, the presumption of constitutionality stands, unless no fair reason can be ascribed for the legislative action. Hardware Dealers' Ins. Co. v. Glidden [284 U. S. 151], 52 S. Ct. 69, 76 L. Ed. 214; O'Gorman v. Hartford Ins. Co., 282 U. S. 251, 51 S. Ct. 130, 75 L. Ed. 324; Standard Oil Co. v. Marysville, 279 U. S. 582, 49 S. Ct. 430, 73 L. Ed. 856. That a legislative classification should stand, 'if any state of facts reasonably can be conceived that would sustain it'; that the burden is on the assailant to show that the classification is 'essentially arbitrary.'"

■ 4. With the foregoing principles of law in mind as postulates, the constitutionality of the provision assailed may be considered. The alleged discriminatory or unequal provisions apply alike in favor of both common carriers and contract haulers when their

motor vehicles are "used exclusively in transporting farm and dairy products from the farm or dairy to warehouse, creamery, or other original storage or market."

It was in evidence that the trucks so used, and subject to the exemption, are owned and operated by farmers in gathering such agricultural products, as 'live stock, cream and milk, from individual farmers and transporting such products to local towns where they are shipped by rail to the city markets. Many of such uses are seasonal and involve very moderate use of the highway.

As an aid to the interpretation of this special exemption, attention has been called to the general exemption contained in section 5264. Such provision makes the act inapplicable to both motor carriers and contract haulers operating in municipal corporations "and the suburban territory adjacent thereto, forming a part of transportation system within such municipal corporation." Section 5264 (b).

"Suburban territory" is defined to mean one mile beyond the corporate limits of any municipality in the state and one mile additional for each 50,000 population or portion thereof. This would extend the zone of operation to many miles outside the corporate limits of a larger city. This provision is not challenged, although it is a clear exemption and discrimination in favor of motor carriers and truck haulers operating within municipalities and suburban territory. Such a provision was recently sustained in Continental Baking Co. et al. v. Woodring et al., 52 S. Ct. 595, 76 L. Ed. ——, decided May 23, 1932, Chief Justice Hughes delivering the opinion. This was the same case as decided by the District Court of Kansas, composed of three judges, reported in 55 F.(2d) 347.

The right of the busses and trucks within the city to make zone delivery without becoming subject to regulatory laws was upheld. It was indicated that the use thereof for such purposes was not extensive.

It is the law that, even though an exemption is a clear discrimination, it is not invalid unless arbitrary. German Alliance Ins. Co. v. Kansas, 233 U. S. 389, loc. cit. 418, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189. In fact the legislative classification may rest on narrow distinctions as decided in German Alliance Ins. Co. v. Kansas, supra.

It must be conceded that the interest of the public is involved in the gathering and marketing of farm products as speedily and economically as possible. The Legislature no doubt had in mind the facts, as same have

been made to appear to us, that the only use made by trucks within the exemption would be in gathering the products of the farmer and transporting them to the nearest shipping point.

Necessarily, this would not involve an extensive use of the highways. In a few instances, no doubt the farmer would live on the state owned and controlled highway, but in most instances this would not be true. In the majority of cases the farmers first reach the state highways at the place of marketing their products. In such cases they would not use the state highways at all. The highways would not be used by the farmer in marketing his product as much as the contract hauler and motor carrier would use the same highways within cities and suburban zones. Moreover, long hauls could not be economically made under this exemption. The motor vehicle employed must return empty, as farm products could not be hauled both ways to market. Again, large heavy trucks could not be used in gathering farm products. Much of the time such trucks would be off of hard-surfaced roads.

A very apposite statement was made by the Supreme Court in Liberty Warehouse Co. v. Tobacco Growers', 276 U. S. 71, loc. cit. 92, 48 S. Ct. 291, 295, 72 L. Ed. 473, where the court said: "Congress has recognized the utility of co-operative association among farmers in the Clayton Act ( * * * [15 USCA § 17]), the Capper-Volstead Act ( * * * [7 USCA §§ 291, 292]), and the Co-operative Marketing Act of 1926 ( * * * [7 USCA §§ 451–457]). These statutes reveal widespread legislative approval of the plan for protecting scattered producers and advancing the public interest."

This is almost the exact situation in the case at bar. The evidence disclosed that farm products were gathered from widely scattered producers upon a co-operative plan. In fact the statutes of Missouri provide for such plan, and, at the time of the legislation under consideration, such co-operative plans were in full operation. Many other reasons can be conceived which would take the legislation in question out of the arbitrary and unreasonable class.

5. Plaintiff relies upon the late case of Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 587, 75 L. Ed. 1264. While the exemption in that case was in language very similar to the language in the case at bar, yet it contained this broad exemption, "or to motor vehicles used exclusively in transporting or delivering dairy products."

It will be observed that this might involve long hauls over the highways and does not restrict deliveries merely for shipping purposes. The same vehicle could be used for hauling both ways.

A Florida statute was under consideration by the court in that case. The complainant challenged its validity in a habeas corpus proceeding after his arrest on a criminal process. It was pointed out by the court that there was confusion as between a contract hauler and common carrier, and that the one could not be separated from the other. Moreover, there was no standard of conduct fixed in the legislation, so that any person subject to the law was necessarily confused as to its meaning and his obligations with respect thereto.

The court specifically said: "It should be observed that this is not an action in equity where the enforcement of a statute awaits the final determination of the court as to validity and scope."

It could easily be inferred that an interpretation of the statute in a proceeding of this character might have sustained its validity. The court expressed its difficulty when it said: "There does not appear to be the slightest justification for making a distinction between those who carry for hire farm products, or milk or butter, or fish or oysters, and those who carry for hire bread or sugar, or tea or coffee, or groceries in general, or other useful commodities."

In the case at bar, a distinction is only made in favor of motor vehicles used in hauling farm products to the nearest market. Such is necessarily a sporadic and, for the most part, seasonal use by a few producers who live along the highway.

In Louis v. Boynton, 53 F.(2d) 471, of the Tenth Circuit, a case in the District Court, three judges sitting, it was held that a similar exemption was an arbitrary discrimination. However, it did not appear that the facts before that court showed that the market referred to in the act was the nearest and that the use of the highway was for the purpose of enabling motor vehicles operated by or on behalf of farmers to gather farm products from the producers and deliver same at the nearest market place. Neither did it appear that such producers were scattered, that they did not live on the highway, and that in most cases in making such delivery to market the state highways were not used.

The exemption in favor of newspaper trucks was not arbitrary. These operate mainly in municipalities and suburban territory. Such operation as may be carried on beyond the suburban zone is negligible and would only involve the use of small truck or passenger cars.

7. It cannot be successfully urged that this suit was prematurely brought or that the court cannot enjoin the prosecution of a criminal offense. While it is the general rule that courts of equity will not restrain the prosecution of criminal proceedings, yet it is also true that a court of equity is not divested of jurisdiction to prevent an act by the mere fact that such act is criminal. Where property rights are involved, if it appears that the act will result in a violation of such property rights, an injunction may be granted. In this case the affidavit of plaintiff not only shows that his property rights would be affected, but it further appears that the drivers of its trucks have been arrested and prosecuted. See Joyce on Injunctions, § 60-a; Hamilton-Brown Shoe Co. v. Saxey, 131 Mo. 212, loc. cit. 222, 32 S. W. 1106, 52 Am. St. Rep. 622.

Upon the evidence before the court in support of the application for an interlocutory order enjoining the enforcement of the act by the Public Service Commission, the court is of the opinion that the application should be denied.

Because of Judge VAN VALKENBURGH'S absence, he has not seen this opinion, but, in accordance with the agreement of the judges in conference, he concurs in the result.