The MUNICIPAL CITY OF SOUTH BEND, Indiana, Appellant (Defendant Below),

v.

John KIMSEY and Denise Kimsey; Bradley Hall and Carole Hall; Terry Trethewey and Cheryl Trethewey; together with the remaining property owners who are signatories hereto and who are too numerous to be included in the caption of this remonstrance complaint, Appellees (Plaintiffs Below).

No. 71S03–0203–CV–183.

Supreme Court of Indiana.

Jan. 15, 2003.

Aladean M. DeRose, South Bend, IN, Attorney for Appellant.

Don G. Blackmond, Lynn M. Butcher, South Bend, IN, Attorneys for Appellees.

## ON PETITION TO TRANSFER

BOEHM, Justice.

Article IV, Section 23 of the Indiana Constitution prohibits special legislation where a general law can be made applicable. We hold that this provision is violated by a 1993 law applicable only to St. Joseph County and permitting a majority of landowners in an affected area of that county to block annexation by a municipality.

### Factual and Procedural Background

Until 1993, if a municipality sought to annex adjacent territory, it needed to satisfy only the requirements of Indiana Code section 36–4–3–13. That section, which remains the law today, set forth a list of conditions ranging from the population and geographic makeup of the area to be annexed to the details that must be included in a fiscal plan prepared by the annexing municipality. If these requirements were met, opposition by a given percentage of landowners was not enough to block annexation.

In 1993, the Indiana General Assembly added a new subsection (g)[1] to section 13. That subsection applied only to counties with a population between 200,000 and 300,000, and granted the right to challenge and defeat annexation if, inter alia, a majority of the landowners in the affected area opposed it.[2] Ind.Code § 36–4–3–13(g) (2002). At the time this provision

1. At the time this action was initiated, the new subsection was codified at § 36–4–3–13(e). It was moved to subsection (g) in the 1999 amendments to the statute.

2. The remonstrators are also required to

was enacted, and ever since then, only St. Joseph County fell within these population parameters. As a result, at the time relevant to this lawsuit, only in St. Joseph County could a given number of affected landowners block an annexation simply by opposing it. In 1999, a new subsection was added affecting every county except St. Joseph and requiring opposition of sixty-five percent, not just a simple majority, to defeat annexation. The net result is that today the statute requires opposition of sixty-five percent of the affected landowners to defeat a municipal annexation in ninety-one of our ninety-two counties, but in St. Joseph County a simple majority is sufficient.[3]

On July 22, 1996, the City of South Bend, acting through its Common Council, adopted an ordinance providing for the annexation of the "Copperfield Annexation Area" in St. Joseph County. Copperfield area residents filed a remonstrance and presented a petition in opposition to annexation purporting to contain the signatures of a majority of Copperfield landowners. After the trial court denied the City's motion to dismiss the remonstrance, the City filed a counterclaim seeking a declaratory judgment that subsection (g) was unconstitutional special legislation in violation of Article IV, Section 23 of the Indiana Constitution. That section provides, in relevant part: "[I]n all ... cases where a general law can be made applicable, all laws shall be general. ..."

The trial court denied the City's motion, holding that subsection (g) was constitutional "general" legislation concerning

"[t]he loss of rural land" and "[a]rguably ... reflects a political decision by the General Assembly that urbanization in this state should be restricted and that: (a) counties of more than 300,000 people have already lost their rural character and (b) that counties of less than 200,000 people are not at risk." Because the trial court viewed subsection (g) as "general" legislation as that term appears in Article IV, it did not address the question whether, if this were a "special" law, a general law "can be made applicable."

The City subsequently filed a unilateral "stipulation of facts," to which the remonstrators did not object, and the trial court proceeded to address the merits of the case without trial. Having determined that the remonstrators' petition was sufficient, the trial court blocked the annexation. The Court of Appeals affirmed the trial court. *City of South Bend v. Kimsey,* 751 N.E.2d 805, 812 (Ind.Ct.App.2001). This Court granted transfer.

## I. Origins of the Ban on "Special Legislation"

Limits on "special legislation" are found, "in some form or other, in most state constitutions." Osborne M. Reynolds, *Local Government Law* 85–86 (1982). Their purpose is "to prevent state legislatures from granting preferences to some local units or areas within the state, and thus creating an irregular system of laws, lacking state-wide uniformity." *Id.* at 86. This "irregularity" is not in itself the only perceived evil. In the view of the proponents of these provisions, if special laws

---

show: (1) police and fire protection, and street and road maintenance services are already adequately provided by a source other than the municipality; and (2) the annexation would have a significant financial impact on the residents or owners of land. Ind.Code § 36–4–3–13(g) (2002).

3. As an alternative to opposition by a majority of landowners, the remonstrators may show opposition by the owners of more than seventy-five percent of the assessed valuation of the land. I.C. § 36–4–3–13(g). That alternative is also available for all other counties under subsection (e) as it stands today. *Id.* § 36–4–3–13(e).

are permitted, the result is perceived to be "a situation in which it [becomes] customary for members of the legislature to vote for the local bills of others in return for comparable cooperation from them (a practice often termed 'logrolling')." *Id.* In simple terms, these anti-logrolling provisions are grounded in the view that as long as a law affects only one small area of the state, voters in most areas will be ignorant of and indifferent to it. As a result, many legislators will be tempted, some would say expected, to support the proposals of the legislators from the affected area, even if they deem the proposal to be bad policy that they could not support if it affected their own constituents.[4]

In fact, the drafters of the 1851 Indiana Constitution saw one of their principal challenges to be reining in a "large and constantly increasing number" of special laws. At the Constitutional Debates, John Pettit, of Tippecanoe County, described special legislation as "the whole error—the whole incongruity—the whole oppression of our law, and almost the whole necessity of calling this Convention." 2 *Reports of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 1771 (1850). Others complained of the diversion from matters of statewide concern generated by an excessive volume of local legislation. Governor Paris Dunning addressed the General Assembly on this note:

Special legislation is a growing evil which has attracted much attention amongst the masses of the people, and to which much well founded opposition exists in the public mind. Indeed, it has for years past engaged full three-fourths of the time of the General Assembly, to the exclusion (from their due consideration) of many other questions of great importance to the people of the State.

1 Charles Kettleborough, *Constitution Making in Indiana* 195 (Ind. Historical Bureau ed. 1971) (1916). The drafters responded to these concerns by adopting Sections 22 and 23 of Article IV. Article IV, Section 22 prohibits the General Assembly from passing local or special laws to accomplish certain enumerated results, none of which is relevant here.[5] In addi-

---

4. Justice Sullivan sees significance in the narrow vote approving the statute in this case. We do not. The "logrolling" issue Article IV addresses is not that the legislators have no interest in special legislation. They may indeed be very interested in using their vote as a trading chip for special legislation of their own or for other considerations. But their constituents do not share that interest, leaving legislators from unaffected areas free from accountability to concerned voters. Whether Article IV, Section 23's effort to limit logrolling is wise is not the issue. The Constitution makes that call for us.

5. Article IV, Section 22 states:

The General Assembly shall not pass local or special laws: Providing for the punishment of crimes and misdemeanors; Regulating the practice in courts of justice; Providing for changing the venue in civil and criminal cases; Granting divorces; Changing the names of persons; Providing for laying out, opening, and working on, highways, and for the election or appointment of supervisors; Vacating roads, town plats, streets, alleys, and public squares; Summoning and empaneling grand and petit juries, and providing for their compensation; Providing for the assessment and collection of taxes for State, county, township, or road purposes; Providing for the support of common schools, or the preservation of school funds; Relating to fees or salaries, except that the laws may be so made as to grade the compensation of officers in proportion to the population and the necessary services required; Relating to interest on money; Providing for opening and conducting elections of State, county, or township officers, and designating the places of voting; Providing for the sale of real estate belonging to minors or other persons laboring under legal disabilities, by executors, administrators, guardians, or trustees.

tion to Section 22's prohibition of "special" legislation on specified topics, Article IV, Section 23 added a residual demand for "general" legislation: "In all the cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State."

## II. Earlier Judicial Review of "Special" Legislation

Although the text of Section 23 has remained unaltered since it was placed in the Constitution in 1851, it has been subject to a variety of interpretations over the intervening 151 years. It was initially thought that Article IV presented no justiciable issue. This view was first articulated in *Gentile v. State*, 29 Ind. 409 (1868), and continued through the nineteenth century and into the early part of the twentieth. As this Court put it in *Bd. of Comm'rs v. Fetter*, 193 Ind. 288, 296, 139 N.E. 451, 454 (1923):

> Upon the authority of numerous decided cases from this court, and from the courts of other states which have constitutional limitations akin to the one here in question, the rule is firmly fixed that the question whether or not a general law can be made applicable, or that a special law is in violation of said section of the constitution because a general law can be made applicable, is necessarily one of legislative discretion, and not one of judicial determination.

In *Groves v. Bd. of Comm'rs*, 209 Ind. 371, 199 N.E. 137 (1936), this Court moved from the view that Article IV, Section 23 presented no justiciable issue to the doctrine that statutes general in form were "general" for purposes of Article IV even if they applied in practical terms to only one or a few counties. The Court addressed a statute applying only to counties "having a population of not less than 250,-000 nor more than 400,000, and having three or more cities, each with a population of 50,000 or more." *Id.* at 375, 199 N.E. at 139. Lake County alone met those criteria. The Court held: "If the act is broad enough to apply to all counties of the state under the same circumstances, it cannot be condemned." *Id.* at 376, 199 N.E. at 140. Whatever the realistic prospect that another county might ever meet these parameters and also contain three cities, each of 50,000 population, there remains at least the theoretical prospect that smaller counties could over time grow to meet these criteria. Similarly, Lake County might lose one of its three cities of 50,000, or fall outside the 250,000-to-400,-000 bracket. Based on these logical if practically remote possibilities, this Court held that "[u]nder such circumstances, the law is general in its application and not local or special," *id.*, and inquired no further.

A variation of complete deference to classification by population upheld several statutes against Article IV attack on the basis that singling out the affected areas was "reasonable." In *Long v. State*, 175 Ind. 17, 20, 92 N.E. 653, 654 (1910), this Court stated, "Many of our penal statutes have exclusive application to special localities or objects, and are nevertheless general and unquestionably valid, because they rest upon an inherent and substantial basis of classification." Similarly, in *Kelly v. Finney*, 207 Ind. 557, 579, 194 N.E. 157, 166 (1935), this Court cited *Long* for the proposition that "[t]he fact that a statute exempts from its operation certain classes does not render the act local or special as long as the classification is not unreasonable or arbitrary." Reflecting the similarity of equal protection doctrine to this line of reasoning under Article IV, Section 23, the *Kelly* Court also cited *Continental Baking Co. v. Woodring*, 286 U.S. 352, 52

S.Ct. 595, 76 L.Ed. 1155 (1932), and *Schwartzman Serv., Inc. v. Stahl*, 60 F.2d 1034 (W.D.Mo.1932), for that proposition. Neither of these federal court decisions addressed Article IV, or indeed any state constitutional provision. *Continental Baking* dealt with state regulations on commercial highway hauling, and involved only constitutional challenges under the federal Due Process, Equal Protection, Privileges and Immunities, and Commerce Clauses. 286 U.S. at 357, 52 S.Ct. 595. *Schwartzman* addressed the constitutionality of similar regulations, and although it did not specify the constitutional provisions on which it based its decision, it presumably was also decided under federal constitutional law.[6]

The approach of *Long* and *Kelly* also appeared in *Evansville–Vanderburgh Levee Auth. Dist. v. Kamp*, 240 Ind. 659, 168 N.E.2d 208 (1960), where a statute allowed the creation of a joint city-county levee authority district in any city within a county having a population between 160,-000 and 180,000. At the time the statute was enacted, only Vanderburgh County fell within this population bracket. A Vanderburgh County taxpayer filed suit contending, inter alia, that the statute was unconstitutional special legislation. This Court upheld the statute, stating, "[T]he presence of [some arbitrariness due to the use of population classifications] does not make the legislation special if there still remains some relationship between such classification and the objective of the law which the legislature could have considered to exist." *Id.* at 663, 168 N.E.2d at 210.

Finally, adopting the same view, *Dortch v. Lugar*, 255 Ind. 545, 266 N.E.2d 25 (1971), relied on *Kamp* and *Kelly* in upholding the Unigov statute for Marion County. That statute reorganized local municipal and county government in all counties containing "a city of the first class" and included a stated purpose "to enable the consolidation of governmental functions in densely populated metropolitan communities." *Id.* at 550, 266 N.E.2d at 30. Unigov, then and now, applied only to Marion County, which contains Indianapolis, the only Indiana city of the first class. In upholding the statute, this Court stated, "As a general proposition ... it is sufficient for purposes of §§ 22 and 23 of Art. 4 [i]f ... the classification is reasonable and naturally inherent in the subject matter." *Id.* at 552–53, 266 N.E.2d at 31. Although these cases were consistent in their view that reasonableness of the classification validated a law under Article IV, none of these holdings addressed the history behind Article IV, Section 23. More importantly, none explained at any length whether the reasonableness of the classification is a touchstone in determining whether a law is general or special, or whether it otherwise preserved a statute attacked under Article IV.

The "reasonableness" approach to Article IV issues is strongly reminiscent of concepts derived from the "equal privileges and immunities" clause of Article I, unfortunately also numbered Section 23. That provision of Article I states, "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." To comply with that section, legislation that singles out one person or class of persons to receive a privilege or immunity

---

6. The court in *Schwartzman* stated that the case involved "the constitutional validity" of certain statutes, 60 F.2d at 1035, but cited no specific state or federal constitutional provi- sion. The opinion did, however, cite to the United States Supreme Court's ruling in *Continental Baking, id.* at 1037, which is clearly a federal constitution case.

not equally provided to others must meet two requirements. First, it "must be based upon distinctive, inherent characteristics which rationally distinguish the unequally treated class, and the disparate treatment accorded by the legislation must be reasonably related to such distinguishing characteristics." *Collins v. Day*, 644 N.E.2d 72, 79 (Ind.1994). Second, "any privileged classification must be open to any and all persons who share the inherent characteristics which distinguish and justify the classification, with the special treatment accorded to any particular classification extended equally to all persons." *Id.* Although *Collins v. Day* reformulated the Equal Privileges Clause in 1994, the *Collins* test is reminiscent of many earlier decisions under the Special Legislation Clause, including *Long, Kelly*, and *Dortch.*

Under this line of cases, and in light of *Collins'* restatement of the Equal Privileges Clause test, there seemed to be little difference between Article IV special legislation and Article I unequal privileges. So viewed, the Article IV restraint on "special laws" becomes the reasonable classification focus imposed by Article I. In other words, for a special law to be imposed, it must be reasonably related to inherent characteristics of the territory in which it is applied, and apply equally to those who share those characteristics. Thus, legislation that applies in less than the entire state would pass both Article I and Article IV muster by the same standard.

In the meantime, however, in 1986 this Court returned to complete deference to population ranges as ipso facto "general" statutes. In *N. Twp. Advisory Bd. v. Mamala*, 490 N.E.2d 725, 726 (Ind.1986), the Court upheld a statute affecting the operation of parks located "in each township having a population of not less than one hundred eighty thousand (180,000) nor more than two hundred four thousand (204,000) that is located in a county having more than two second class cities." Only one township in the state fell within that classification. This Court held the law was general because the statute did not "contain any provision which would either preclude other townships from eventually qualifying under the statute or would prevent North Township from falling outside the parameters of the statute." *Id.* Only the most generous deference to legislative judgment could uphold this quite particularized legislation, which presented a classic example of the perceived local legislation that gave rise to Article IV. Indeed, virtually any geographic area can be uniquely defined with such very specific population parameters in concert with other characteristics. *Mamala* thus represented in practical terms a return to the view that Article IV presents no justiciable issue at all.

### III. Judicial Review of "Special" Legislation Today

#### A. *Identifying General or Special Legislation*

■ It is now clear that although the reasonableness of a population classification remains relevant under Article I, neither the "per se" nor "reasonableness" view of population categories is determinative of constitutionality under Article IV. Rather, the text of Article IV, Section 23 is controlling here. The terms "general law" and "special law" have widely understood meanings. A statute is "general" if it applies "to all persons or places of a specified class throughout the state." Black's Law Dictionary 890 (7th ed. 1999). A statute is "special" if it "pertains to and affects a particular case, person, place, or thing, as opposed to the general public." *Id.* Most recently, in *Williams v. State*, 724 N.E.2d 1070, 1085 (Ind.2000), this Court reiterated the view that the text of Article IV, Section 23 requires a two-step test that ad-

dresses concerns unique to that section: "In analyzing a law under [Article IV,] Section 23, we must first determine whether the law is general or special. If the law is general, we must then determine whether it is applied generally throughout the State. If it is special, we must decide whether it is constitutionally permissible."

*Williams* followed *Ind. Gaming Comm'n v. Moseley*, 643 N.E.2d 296, 299–301 (Ind.1994), and *State v. Hoovler*, 668 N.E.2d 1229 (Ind.1996), on this point.[7] *Williams* found that the specific needs of Lake County—a large county with a larger case docket—supported special legislation providing for the appointment of magistrates only in Lake County courts. *Moseley* upheld a statute that applied only to counties eligible to vote to adopt riverboat gambling, and provided for city-by-city voting in counties bordering Lake Michigan with more than 400,000 people, i.e., in Lake County, while other counties eligible to adopt dockside gambling did so on a countywide basis. 643 N.E.2d at 301. This Court found this different treatment for Lake County to be justified:

> In Lake County, the whole of the waterfront is covered by substantial cities, whose residents have the greatest interest in how the shore is used. In all other counties, however, the shore contains both incorporated and unincorporated territory. It thus seems sensible to stage a vote of all persons in the county.

*Id.*

In *Hoovler*, this Court followed *Moseley* and pierced the claim that a population criteria based statute was "general" legislation, but again nevertheless found the statute valid. *Hoovler* dealt with the legislature's attempt to help Tippecanoe County handle the financial burden of cleanup costs at a "Superfund" landfill site. 668 N.E.2d at 1234. The statute permitted the county council of a qualifying county to impose a higher county income tax rate than was permitted in other counties in the state. Only Tippecanoe County qualified under the legislation, but the statute did not identify Tippecanoe County by name. Rather, it applied only to counties "having a population of more than one hundred twenty-nine thousand (129,000) but less than one hundred thirty-thousand six hundred (130,600)." *Id.* at 1231.

Rather than validating this legislation on the ground that population categories per se create general statutes, this Court examined the "circumstances surrounding

---

7. In viewing the first issue as identification of a law as "special" or "general," we agree with some states and disagree with others. The Louisiana Supreme Court put it precisely as we do: "An analysis of whether a statute constitutes an unconstitutional local or special law begins with a determination of whether the law is, in fact, local or special." *Morial v. Smith & Wesson Corp.*, 785 So.2d 1, 17 (La.2001). Other states, like some earlier Indiana cases, rely on the reasonableness of the classification to determine whether a particular statute is special legislation. *See, e.g., Concerned Taxpayers of Kootenai County v. Kootenai County*, 137 Idaho 496, 50 P.3d 991, 994 (2002) ("The test for determining whether a law is local or special is whether the classification is ... unreasonable."). Arizona's constitution considers a "special law" to be the equivalent of the legislation the Indiana Constitution prohibits in Article I, Section 23, with that state's courts also employing a reasonableness test. *See Sherman v. City of Tempe*, 202 Ariz. 339, 45 P.3d 336, 341 (2002) ("An unconstitutional special law grants 'to any corporation, association, or individual, any special or exclusive privileges.' To determine whether a law is a special law we first consider whether the classification created by the law has a reasonable basis.") (citation omitted). Illinois also says it generally judges equal protection and special legislation challenges "under the same standards." *Miller v. Rosenberg*, 196 Ill.2d 50, 255 Ill.Dec. 464, 749 N.E.2d 946, 952 (2001).

[the Act], including language in the Act itself." *Id.* at 1234. The Court held that because the legislature intended the statute in that case to apply exclusively to Tippecanoe County, the statute was indeed "special" legislation governed by Article IV. *Id.* at 1235. In reaching this conclusion, the Court pointed to the narrow population range in the statute, the fact that Tippecanoe County was the only Indiana county with a Superfund site for which local government entities were designated Potentially Responsible Parties by the EPA, and the statute's intent to provide relief to Tippecanoe County from its potential Superfund liability, reflected in its requirement that the county council find that money is needed to "fund substance removal and remedial action." *Id.* at 1234–35. All of these factors were signs that the legislature had indeed "enacted a special law authorizing Tippecanoe County to enact and administer a special tax rate increase not available to any other county." *Id.* at 1235.

## B. *"Defining Characteristics" and "Justifying Characteristics"*

We agree with the view that a statute with a population category is a special law if it "is designed to operate upon or benefit only particular municipalities and thus is essentially no different than if the statute had identified the particular municipalities by name." *City of Miami v. McGrath*, 824 So.2d 143, 148 (Fla.2002). *Moseley, Hoovler*, and *Williams* clearly implied that those pieces of legislation would have been permissible under Article IV if they had identified the affected counties by name. Indeed, Article IV issues will be simplified if that is done, accompanied by legislative findings as to the facts justifying the legislation's limited territorial application. Legislation applying by its terms to areas with identified characteristics would be equally permissible under Article IV.

The statute in *Hoovler* defined the class of counties to which it applied in terms of population. The opinion justified the classification in terms of the presence vel non of a county's exposure to Superfund liability. *Moseley*, on the other hand, addressed a statute whose defining characteristics were in part those justifying the classification (bodies of water) and in part population parameters that only Lake County met. Thus its defining characteristics were only partially those that justified the classification, and, like *Hoovler*, judicial notice of the geography and municipalities in Lake County was necessary to justify the classification. Finally, in *Williams*, Lake County was identified by name, and its characteristics justifying the legislation were judicially noticed.

In some other legislation that has been challenged under Article IV, the characteristics defining the applicable counties are also those that justify the legislation. Thus, in *Dortch*, a city of the first class in a county was properly thought to justify countywide government. This form of classification is more elegant because it avoids the messiness created by potential entrants (new Superfund sites) or exits (park districts in counties growing out of population parameters) over time. Despite these potential issues, *Hoovler* made clear that a defining characteristic (a population category) that is theoretically unrelated to the justifying characteristic (Superfund liability) is nevertheless permissible if, under the facts as they are at the time of passage, only justified areas are defined into the class. This is defensible because the perceived evils of special legislation in the absence of special circumstances are largely avoided if the affected area is indeed the only part of the state where the statute has practical effect.

■ In sum, if there are characteristics of the locality that distinguish it for purposes of the legislation, and the legislation identifies the locality, it is special legislation. The identification of the locality may be by name ("Tippecanoe County"), by the characteristic that justifies special legislation (a unique Superfund liability), or otherwise (population parameters that include only the locality).

### C. *Determining Whether a General Law "Can Be Made Applicable"*

*Moseley, Williams,* and *Hoovler,* were not revolutionary in viewing the threshold issue as identifying a law as special or general. *Gentile v. State,* 29 Ind. 409 (1868), which was decided seventeen years after Article IV was adopted, included some useful insight on that point:

[Article IV, Section 23] was intended to prohibit the passage of any law applicable only to one or more counties, or other territorial subdivisions of the State, where a general law on the same subject could be made which would properly apply to the entire state.... It is clearly implied by that section, and we know it to be true in fact, that in many cases local laws are necessary, because general ones cannot, properly and justly, be made applicable. There are cases where a law would be both proper and necessary in a given locality or part of the state, where its subject is local, or where, from local facts, it is rendered necessary; but which, if made general, would either be inoperative in portions of the state, or from its inapplicability to such portions, would be injurious and unjust.

*Id.* at 411–12. As *Gentile* reveals, legislation must be classified as general or special before the focus turns to whether a general law "can apply," i.e., whether there

are inherent characteristics of the affected locale that justify local legislation.

■ Thus, the reasonableness of a classification does not answer whether the law is general or special in the first place. Nor does it provide a complete answer to the question whether a general law "can be made applicable," although one branch of that inquiry may resemble an Article I analysis. A statute general in form "can be made applicable" only if it does not violate Article I, Section 23. Thus, if population classifications are arbitrary or unrelated to the characteristics that define the class, a statute general in form is nevertheless unconstitutional as a violation of Article I. This can be true under *Collins* either because there is no defining characteristic of the classified area, or there is such a characteristic but it is shared with areas not in the class.

A second consideration in whether a general law "can be made applicable" is whether in fact it is meaningful in a variety of places or whether relevant traits of the affected area are distinctive such that the law's application elsewhere has no effect. This second consideration turns on whether "local facts" exist, not on whether those facts are reasonably related to the particular legislation that is actually imposed, a question that is left to Article I.

Article IV issues, though distinct from Article I considerations, remain closely related to them. If special legislation passes the first test of *Collins,* i.e., the legislation is reasonably related to "inherent characteristics" of the affected locale, and it also passes the second by applying wherever the justifying characteristics are found, then the statute necessarily passes Article IV muster because the presence of those "inherent characteristics" means a general law cannot "be made applicable." Otherwise stated, if the conditions the law addresses are found in at least a variety of

places throughout the state, a general law can be made applicable and is required by Article IV, and special legislation is not permitted. Applying these principles, assuming the facts of the affected area are distinct, *Long, Dortch,* and other cases relying on the proposition that Article IV, Section 23 challenges are resolved by addressing the reasonableness of the classification embodied in the statute are nevertheless correct in their ultimate result.

## IV. Applying Article IV, Section 23 to Subsection (g)

### A. *Subsection (g) is Special Legislation*

■ The decisions of the trial court and Court of Appeals in this case reflected both the "reasonable classification" approach and the view that population classifications are per se permissible under Article IV as general legislation. As both courts pointed out, any county could theoretically move into the 200,000–to–300,000 person population category defined by subsection (g), from above or below those points, and thus the statute, being "susceptible of uniform application to any county in the State meeting the population criteria," was general, not special, legislation. *Kimsey,* 751 N.E.2d at 811–12. The Court of Appeals also stated: "Notwithstanding Section 23, the legislature may make classifications of subjects of legislation, provided the classification is reasonable and the statute operates equally on all within the class. The statute is then considered to be general." *Id.* at 810 (citations omitted). As explained in Part III, these considerations are relevant if not controlling on the issue of whether "a general law can be made applicable." But neither of these points addresses the threshold issue whether subsection (g) is general or special under *Moseley, Hoovler,* and *Williams.*

As in *Hoovler,* the circumstances surrounding the enactment of subsection (g) leads to the conclusion that this statute is "special" legislation. *State v. Hoovler,* 668 N.E.2d 1229, 1234–35 (Ind.1996). Public Law No. 257 was introduced as amendatory legislation in 1993 by a Representative from St. Joseph County, and sponsored in the Senate by a Senator whose district included both St. Joseph and Elkhart Counties. The bill declared an emergency requiring immediate effect. 1993 Ind. Acts 257 § 4. Because Section 3 of the bill applied only to St. Joseph County at the time of its enactment and for the foreseeable future, and immediate effect was required, the legislature necessarily intended it to address some issue peculiar to St. Joseph County. Thus the evidence is clear that, at the time it was enacted, subsection (g)'s population classification served no purpose other than to identify St. Joseph County. This is no different than had the legislature simply named St. Joseph County in the statute, as was the case in *Williams,* where the statute specifically stated that it governed the courts of Lake County. Moreover, later amendments did not change the special status of St. Joseph County. In *Moseley,* it was apparent that the statute at issue was special legislation because it affected Lake County differently from other counties allowed to permit dockside gambling, and also rendered most Indiana counties unable to participate in dockside gambling. *Ind. Gaming Comm'n v. Moseley,* 643 N.E.2d 296, 301 (Ind.1994). Here, the singling out of St. Joseph County is just as severe. Section 36–4–3–13 now requires the opposition of sixty-five percent of landowners to defeat annexation in every other county in the State, but retains the majority requirement for St. Joseph County. Ind.Code § 36–4–3–13(e) (2002).

B. *Subsection (g) Addresses Conditions Where a General Law Can be Made Applicable*

We agree with the Court of Appeals that the statute is presumed constitutional. The Court of Appeals noted the general principle that "[a]ny reasonable interpretation of a statute is sufficient if it evokes a finding of constitutionality." 751 N.E.2d at 812. This doctrine calls for adopting one among multiple meanings of the statute if that interpretation renders the legislation valid. Here there is no issue as to what the subsection means. More relevant is the point that the challenging party must negate "every conceivable basis which might have supported the classification." *Id.* (quoting *Am. Legion Post # 113 v. State,* 656 N.E.2d 1190, 1192 (1995)). This may be done by presenting evidence establishing the lack of distinct characteristics, or, as in *Williams,* the relevant facts may be subject to judicial notice.

In this case, several different explanations were offered to justify the subsection's application only in counties of 200,000 to 300,000 population. But these reasons were all couched in terms of characteristics of St. Joseph County, not necessarily those possessed by a county of this population size. They ranged from the need to preserve rural land around urban areas (South Bend), which the trial court "judicially noticed," to preventing competing cities (South Bend and Mishakwaka) within the same county

from annexing each other's land, which the Attorney General advanced in the trial court. But none of these justifications are inherent in the population range and none turn on facts unique to St. Joseph County. Preserving rural land near urban areas or preventing competing annexation by different municipalities may indeed be legitimate concerns, but there is no basis to conclude they are unique to St. Joseph County. Although the trial court took judicial notice of the fact that St. Joseph County is largely urban but contains significant rural areas, the same is true of Lake and Allen Counties. Several counties have multiple municipalities capable of exercising annexation powers. In short, we are directed to nothing in the record and no relevant facts susceptible of judicial notice that are unique to St. Joseph County. Accordingly, this legislation is unconstitutional special legislation.

In contrast to this record, in *Hoovler,* Tippecanoe County's unique Superfund site needs were well-documented. Thus, the proponents of that special legislation had a factual basis upon which to rest their assertion that a general statute could not apply.[8] In *Moseley,* the makeup of Lake County, where most of the land contiguous to Lake Michigan is occupied by cities of significant size, justified a voting procedure different from that employed in other counties eligible to adopt dockside gambling.[9] Similarly, in *Williams,* the specific

---

8. Justice Sullivan points out that there are at least fifteen other Indiana counties with Superfund sites. This wholly misses the point. The Superfund liability described in *Hoovler* was unique because Tippecanoe County had the only site in the state for which local governmental entities had been designated Potentially Responsible Parties by the EPA. *Hoovler,* 668 N.E.2d at 1234. The issue is whether the county government had major Superfund exposure, not whether a Superfund site was

located in the county but funded by private "Potentially Responsible Parties."

9. Justice Sullivan describes the issue in *Moseley* as whether riverboat gambling was appropriately permitted in areas contiguous to Lake Michigan, the Ohio River, and Patoka Lake and not in other Indiana locales bordering other large bodies of water. As this Court explained, the issue was not that, but rather whether the different voting procedures in the

judicial needs of Lake County supported specific legislation providing for the appointment of magistrates in that county alone. Thus, the statute in each case was constitutional special legislation by reason of facts of record or judicially noticeable.

Justice Sullivan is mistaken in claiming that we apply an Article I, Section 23 equal privileges test to this case. We have noted the historical similarity of some but not all aspects of Article IV issues to Article I analysis, but our decision is based on Article IV alone.[10] We also disagree with Justice Sullivan's description of this Court's Article IV, Section 23 precedent as uniformly deferring to the legislature's judgment. Although the cases described by Justice Sullivan all upheld the legislative action, they did so on the merits.

They also plainly found that the issues presented by an Article IV, Section 23 challenge were within the province of the judiciary to decide. Indeed that is what judicial review means.

■ Justice Sullivan in substance argues for a doctrine of nonjusticiability of Article IV issues. But for over seventy years precedent has uniformly rejected that view. We think Article IV presents a powerful case for judicial enforcement of a constitutional provision. Forty years ago, judicial intervention was necessary in the area of legislative reapportionment to correct massive imbalances in representation occasioned by the legislature's inability or unwillingness to recognize the need to redistrict.[11] In simple terms, the legislators

counties permitted to have riverboat gambling satisfied Article IV, Section 23:

> To their credit, counsel for appellees recognize [that limiting the locations of riverboats to the specified counties naturally flows from the fact that not every county is home to a suitable body of water], and argue beyond it that all counties selected must still be treated alike. We conclude that the distinctions drawn between Lake County and the others fit this purpose of this local law. In Lake County, the whole of the waterfront is covered by substantial cities, whose residents have the greatest interest in how the shore is used. In all the other counties, however, the shore contains both incorporated and unincorporated territory. It thus seems sensible to stage a vote of all persons in the county.

*Moseley*, 643 N.E.2d at 301. *Moseley* thus turned on facts specific to Lake County as distinguished from the other counties authorized to adopt riverboat gambling.

**10.** To be sure, Article I confers rights on "citizens." But we do not mean to imply acceptance of Justice Sullivan's suggestion that citizens who are classified by geographic locale have any less claim to equal privileges and immunities than those classified by any other means. This, however, is an issue for another day.

**11.** The 1960 election was conducted using districts drawn based on the 1920 census.

*Stout v. Hendricks*, 228 F.Supp. 568 (S.D.Ind. 1963). By reason of the enormous growth of cities and suburbs in the intervening period, by 1960 some representatives were elected from districts four times the size of others. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), were regarded as muscular exercises of judicial power forty years ago, but in retrospect are widely accepted as necessary checks on legislative discretion for the very reason that the normal incentives of the legislature to act in the overall public interest are disabled if each individual legislator is benefited by the status quo. See Martin D. Carcieri, *Bush v. Gore and Equal Protection*, 53 S.C. L.Rev. 63, 76–77 (Fall 2001) ("In some cases, notably the voting rights cases, [for example *Baker v. Carr* and *Reynolds v. Sims*] the judicial role can be defended as necessary to safeguard the equal access of every American to elected officials and institutions of governance. Even if the institutional limitations of the adjudicatory process decrease the possibility that courts can provide comprehensive solutions, on balance the good done by the judiciary in these cases of political process failure outweighs the harm."); Richard H. Pildes, *Voting Rights, Equality, and Racial Gerrymandering: Diffusion of Political Power and the Voting Rights Act*, 24 Harv. J.L. & Pub. Pol'y 119, 126–27 (Fall 2000) ("The Su-

and their constituents who were overrepresented had no interest in remedying the situation. Special legislation presents a similar issue because it eliminates the normal pressures of constituent objection to unwise policy. This is less debilitating than the paralyzing effect of unremedied malapportionment. But the appropriateness of entertaining claims of unconstitutional special legislation is fortified by the express constitutional provision found in Article IV, Section 23. Moreover, both the 1816 and 1851 constitutions were adopted at a time when judicial review of legislation for conformity to constitutional text was well established. As we held in *Dawson v. Shaver*, 1 Blackf. 204, 206–07 (1822), citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803): "The task is delicate and unpleasant, but the duty of the Court is imperative, and its authority is unquestionable, to declare any part of a statute null and void that expressly contravenes the provisions of the constitution, to which the legislature itself owes its existence." This case adds no new doctrine to the analysis of *Moseley, Hoovler,* and *Williams,* and the legislature has taken no steps to eliminate Article IV, Section 23 in the years since those cases were decided. Because "special legislation" doctrine derives solely from Article IV, Section 23, it can readily be repealed if two sessions of the General Assembly approve that decision and the voters ratify it. We neither advocate nor oppose the wisdom of Section 23. Rather, the Constitution makes that decision for us.

## V. Severability

■ Public Law No. 257, which contained subsection (g)—at the time, subsection (e)—did not include a "severability clause," i.e., a provision that "keeps the remaining provisions of a ... statute in force if any portion of that ... statute is judicially declared ... unconstitutional." Black's Law Dictionary 1378 (7th ed. 1999). Thus we are given no guidance from the legislature as to what portions of Public Law No. 257, if any, survive subsection (g)'s violation of Article IV. This Court applies the test for severability stated by the United States Supreme Court in *Dorchy v. Kansas:*

> A statute bad in part is not necessarily void in its entirety. Provisions within the legislative power may stand if separable from the bad. But a provision, inherently unobjectionable, cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall.

*State v. Monfort,* 723 N.E.2d 407, 415 (Ind. 2000) (quoting *Dorchy,* 264 U.S. 286, 289–90, 44 S.Ct. 323, 68 L.Ed. 686 (1924)). The issue is whether the legislature would have passed the remaining parts of Public Law No. 257 had it been presented without the invalid features. *Id.*

### A. Subsection 36–4–3–13(g)

The offending portion of Ind.Code § 36–4–3–13(g) is the 200,000 to 300,000 population category. In order to save the remainder of the subsection, its provisions would have to apply statewide such that any annexation by an Indiana municipality could be defeated by a majority vote of landowners in the affected area. We re-

---

preme Court's initial development of the one-person, one-vote doctrine came in the context of the grotesque, massive malapportionments characteristic at the time of *Baker v. Carr* and *Reynolds v. Sims.* That doctrine resulted in the necessary destabilization of a democratic system that had become captured by a small oligopoly that had no interest in changing the rules under which it had been elected.").

ject that conclusion for two reasons. First, applying subsection (g) statewide would conflict with subsection (e), which provides for the defeat of annexation by a sixty-five percent vote in every other county in the state. Second, it seems clear to us that the legislature would not have passed subsection (g) as appropriate for the entire state.

### B. *Other Amendments Provided by Public Law No. 257*

Public Law No. 257 included two other sections, in addition to Section 3 that enacted subsection (g) and Section 4 declaring an emergency. Section 1 included a minor revision to Indiana Code section 36–4–3–4, and Section 2 amended section 36–4–3–9. This case presents no challenge to either provision and we do not address the validity of either today.

### Conclusion

Despite its facial generality, this Court finds that subsection (g) does, and was intended to, specifically target St. Joseph County. Thus, subsection (g) is special legislation. Although reasons have been advanced to explain why annexation in St. Joseph County must be handled differently than it is in every other county in the state, no facts supporting those reasons have been set forth in the record by the proponents of the special legislation, and we are directed to judicial notice of none. Therefore, under Article IV, Section 23, the application of subsection (g) to prevent the City of South Bend from annexing the Copperfield area is unconstitutional.

The judgment of the trial court is reversed.

SHEPARD, C.J., and DICKSON and RUCKER, JJ., concur.

SULLIVAN, J., dissents with separate opinion.

SULLIVAN, Justice, dissenting.

I dissent. I believe the Court's decision is wrong for the following reasons.

*1. Both precedent and established constitutional jurisprudence counsel upholding the challenged statute.*

As the Court observes, we rejected challenges to the constitutionality of statutes under art. IV, § 23, of the Indiana Constitution as non-justiciable prior to 1936. While it is certainly true that since that time, this Court has adopted different formulations or tests for analyzing such challenges, each result has been the same: the Court has deferred to the Legislature's judgment. In recent years, this has been especially apparent:

In *Evansville–Vanderburgh Levee Authority District v. Kamp*, 240 Ind. 659, 168 N.E.2d 208 (1960), we affirmed the constitutionality of the Legislature's decision to allow Vanderburgh County to have a unique city-county levee authority.

In *Dortch v. Lugar*, 255 Ind. 545, 266 N.E.2d 25 (1971), we affirmed the constitutionality of the Legislature's decision to allow Marion County to have the unique Unigov system of government.

In *Indiana Gaming Commission v. Moseley*, 643 N.E.2d 296 (Ind.1994), we affirmed the constitutionality of the Legislature's decision to allow Lake County to have a unique system for gambling referendums.

In *State v. Hoovler*, 668 N.E.2d 1229 (Ind.1996), we affirmed the constitutionality of the Legislature's decision to allow Tippecanoe County to have a unique environmental cleanup tax.

In *Williams v. State*, 724 N.E.2d 1070 (Ind.2000), we affirmed the constitutionality of the Legislature's decision to allow Lake County to have a unique sys-

tem for the appointment of Superior Court magistrates.

Each of these cases used a somewhat different formulation or test for analyzing the claim but reached a uniform result: that the Legislature was acting within the bounds of its constitutional authority. In my view, the precedent here has not been established so much by the particular words different judges have used in their opinions as by the uniform results those opinions have reached.

These results have been correct and highly appropriate for, as we frequently observe, "Presuming [a] statute to be constitutional, courts place the burden upon the challenger 'to negative every conceivable basis which might have supported'" constitutionality. *Collins v. Day*, 644 N.E.2d 72, 80 (Ind.1994) (upholding the constitutionality of a statute that denied worker's compensation benefits to farm workers) (*quoting Johnson v. St. Vincent Hosp., Inc.*, 273 Ind. 374, 392, 404 N.E.2d 585, 597 (1980) (upholding the constitutionality of the Indiana medical malpractice act)). Such reasoning is deeply grounded in the jurisprudence of judicial review that recognizes people's elected representatives in a democracy, not unelected judges, are entrusted with the lawmaking power. Judicial review of the legality of such laws poses a "countermajoritarian difficulty."[1] Unless a challenged statute is within the scope of the Bill of Rights, is directed against discrete and insular minorities, or restricts those political processes that can ordinarily be expected to bring about repeal of undesirable legislation, American

courts presume constitutionality. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152–53 & n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

The legislation at issue here represents a political struggle between suburban and urban interests. While the geographic focus of this particular law was St. Joseph County, the legislative history shows a hard-fought battle in which the suburban interests narrowly prevailed. The vote in the House of Representatives on the bill was 51–49—the minimum number necessary to pass.[2] The vote in the Senate on the bill was 27–19—one more than the minimum.[3] Such close votes indicate that this was a bill with significance well beyond St. Joseph County. It is a classic case of the countermajoritarian difficulty when a court intervenes to turn those who lost a close fight in the Legislature into winners.

*2. The Court gives little guidance to the General Assembly for the future.*

In the future, the Legislature will need to contend with today's decision when it attempts to address such questions as flood control in Vanderburgh, Unigov in Marion, riverboat gambling or selection of magistrates in Lake, environmental taxes in Tippecanoe, or annexation in St. Joseph Counties. The Court gives little guidance to the Legislature in how it will answer that question.

The test announced by the Court today is that special legislation will pass constitutional muster only if "the conditions the

---

1. The scholarship is voluminous. The classics include: Learned Hand, *The Bill Of Rights* (1958); Herbert Wechsler, *Toward Neutral Principles of Constitutional Law, in Principles, Politics and Fundamental Law* (1961); Alexander Bickel, *The Supreme Court, 1960 Term Forward: The Passive Virtues*, 75 Harv. L.Rev. 40 (1961); Alexander Bickel, *The Least Dan-*

*gerous Branch* (1962); Gerald Gunther, *The Subtle Vices of the "Passive Virtues"—A Comment on Principle and Expediency in Judicial Review*, 64 Colum. L.Rev. 1 (1964).

2. 1993 H.J. 636.

3. 1993 S.J. 669.

law addresses" are unique to the county to which the legislation applies: "if the conditions the law addresses are found in at least a variety of places throughout the state, a general law can be made applicable and is required by Article IV, and special legislation is not permitted."

But how will this work? Let us take what appears to the Court to be the easiest case, the Tippecanoe County environmental tax at issue in *Hoovler.* The Court tells us that the unique condition the law addresses is that Tippecanoe County has "unique Superfund site needs." But this condition is found in a variety of other counties throughout the state: at least fifteen other Indiana counties have Superfund sites on the U.S. Environmental Protection Agency's Superfund National Priorities List.[4] That is, the law in *Hoovler* clearly addresses conditions "found in at least a variety of places throughout the state." The Court's opinion today says the *Hoovler* statute is permissible but the Court's test indicates that it is not.

Perhaps the greatest difficulty the Legislature will face is trying to figure out what a court will hold to be "the conditions the law addresses." Consider the riverboat gambling statute at issue in *Moseley.* It permits such gambling in certain areas contiguous to Lake Michigan, the Ohio River, and Patoka Lake. If "the conditions the law addresses" are adjacency to large bodies of water, the statute does not meet the Court's test because these conditions are found in a variety of other places: areas adjacent to the Maumee and Wabash Rivers, Lakes Maxinkukee, Wawasee, and Monroe, etc. But perhaps a court will hold the law addresses different conditions. How is the Legislature to know?

*3. The Court renders an enormous body of Indiana law suspect and takes on an enormous burden for the judicial system.*

In the *Moseley* case, one amicus, in an effort to demonstrate how many statutes would be constitutionally questionable if we were to find the riverboat gambling statute violated art. I, § 23, filed an appendix with us with a copy of all such laws. It ran over 500 pages.

With today's decision, the Court renders at least suspect the validity of those 500 pages of the Indiana Code. The only way to resolve the uncertainty will be through litigation, one statute at a time.

*4. The Court improperly subjects the City's claim to art. I, § 23, scrutiny.*

The Court subjects the City's claim to scrutiny under the Equal Privileges and Immunities Clause of art. I, § 23. But art. I, § 23, applies only to "citizens," which a political subdivision is not. (I note the City makes no argument that the statute violates its privileges or immunities.) It is wrong as a textual matter to say that legislation that applies to some geographic areas of the state and not others could violate the Equal Privileges and Immunities Clause; our Bill of Rights does not confer citizenship on political subdivisions. It is also wrong as a jurisprudential matter not to afford more deference to enactments adopted by the legislative branch in the exercise of its powers under art. IV than to legislation within a specific prohibition of the Bill of Rights. *See Carolene Prods.*, 304 U.S. at 152–53 n. 4, 58 S.Ct. 778.

This Court was correct when it held that claims under art. IV, § 23, presented no justiciable issue. *Board of Comm'rs of*

---

**4.** *See* http:// www.epa.gov/superfund/ sites/ npl/in.htm (visited Jan. 15, 2003). Indiana has many more Superfund sites that do not rise to the level of a National Priority Site. See http:// www.epa.gov/superfund/ sites/cur-sites/incerlst.htm (visited Jan. 15, 2003).

*Jennings County v. Fetter*, 193 Ind. 288, 296, 139 N.E. 451, 454 (1923); *Gentile v. State*, 29 Ind. 409 (1868).[5]

---

**5.** These early cases deserve more credit than the Court gives them today because cases decided close to the time of the enactment of the constitutional provision help us understand the intent of the framers. *See McIntosh v. Melroe Co.*, 729 N.E.2d 972, 974 (Ind.2000); *Richardson v. State*, 717 N.E.2d 32, 38 (Ind. 1999); *Bayh v. Sonnenburg*, 573 N.E.2d 398, 412 (Ind.1991), *cert. denied* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 415 (1992) (*quoting State v. Gibson*, 36 Ind. 389, 391 (1871)).